IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| CHAD LARKIN and GENNY LARKIN ) ) ) Plaintiffs, ) ) v. ) ) JONATHAN DAY a/k/a JJ DA BOSS, ) PILGRIM OPERATIONS, LLC ) (formerly listed as PILGRIM FILMS ) & TELEVISION, L.L.C. ) d/b/a PILGRIM MEDIA GROUP AND ) OPERATIONS), ) and ) DISCOVERY, INC., ) ) Defendants. ) | DOCKET NO: 2:18-cv-02636-TLP-dkv JURY DEMAND |

## **AMENDED COMPLAINT**

Comes now the Plaintiffs Chad Larkin and Genny Larkin, a husband and wife, and hereby file this amended complaint against the Defendants, for damages. For cause, the Plaintiffs would show"

1. The initial complaint was filed against several defendants including "Pilgrim Films & Television, LLC d/b/a Pilgrim Media Group and Operations." It has been determined based on a corporate disclosure by the Pilgrim defendant that the proper legal entity is "Pilgrim Operations LLC." As such, this amended complaint is filed pursuant to a Court Order.

1

# I. PARTIES

2. The Plaintiffs Chad Larkin and Genny Larkin are citizens and residents of St. Francois County, Missouri. They reside at 6344 Hillsboro Road, Bonne Terre, Missouri 63628. They are a husband and wife. They are, have been and remain legally married at all times relevant to this matter.

3. Upon information and belief, Defendant Johnathan Day, a/k/a "JJ Da Boss," is a citizen and resident of Independence, Arkansas. He resides at 1265 E Main Street, Batesville, Arkansas 72501.

4. Upon information and belief, Defendant Pilgrim Operations, LLC (hereinafter "Pilgrim") is a television production company whose principal business is that of producing reality television shows for the Discovery Channel. Pilgrim's principal place of business is 12020 Chandler Boulevard, Suite 200, North Hollywood, California 91607. Its agent for service of process is Gretchen Stockdale, who may be served at 12020 Chandler Boulevard, Suite 200, North Hollywood, California 91607.

5. Upon information and belief, Defendant Discovery, Inc. (hereinafter "Discovery") is a foreign for-profit corporation whose principal business is to provide television content for its portfolio of brands, including the Discovery Channel. A worldwide company, its worldwide corporate headquarters is located at One Discovery Place, Silver Spring, Maryland 20910-3354. Its United States headquarters is located in Knoxville, Tennessee. Its registered agent for service of process is CT Corporation located at 300 Montvue Road, Knoxville, Tennessee 37919-5546. 300 Montvue Road, Knoxville, Tennessee 37919-5546.

6. Upon information and belief, Day at all times relevant hereto was an authorized agent and/or representative of both Pilgrim Studios and Discovery based on his role and/or employ

as a personality on the American reality television series Memphis Street Outlaws, which is produced by Pilgrim for Discovery.

## II. JURISDICTION AND VENUE

7. This is a lawsuit arising out of an incident that occurred in Shelby County, Tennessee, on or about September 23, 2017. Venue is appropriate in the Western District of Tennessee under 28 U.S.C. § 1391(b)(2) as this is the judicial district in which a substantial part of the events or omissions giving rise to this claim occurred.

8. This Court has original jurisdiction over the subject matter of this case and over all parties pursuant to 28 U.S.C. § 1332 and other legal authorities as there is complete diversity of the parties, and the amount in controversy exceeds $75,000.00 exclusive of interest and costs.

## III. FACTS

9. "Street Outlaws" is a reality television show produced by Defendant Pilgrim for Defendant Discovery. The show, which premiered on the Discovery Channel on June 10, 2013, was and is a highly visible, successful and profitable television program. Proclaiming itself as an inside look into the world of American street racing, the show's format is one in which the hosts of the show compete in illegal street racing. The show is produced by Pilgrim in such a fashion as to create sensationalized and contrived product for the purpose of garnering television ratings.

10. Due to the success of this contrived format, which is anything but reality, Pilgrim and Discovery decided and agreed to "spin off" another version of the show, "Street Outlaws Memphis." As a result, on February 7, 2018, the television show "Street Outlaws Memphis" premiered on February 7, 2018.

11. The "face of Street Outlaws Memphis" is the Defendant Jonathan Day, also known as "JJ Da Boss." JJ Da Boss became very popular from his numerous appearances on Street

Outlaws. As such, when Pilgrim and Discovery decided to create Street Outlaws Memphis, JJ Da Boss was chosen to play the lead role.

12. At all times pertinent to the issues contained in the matter, Defendant Day was acting in the course and scope of his role as an on-air figure/host of the show for Street Outlaws Memphis and as an agent and/or employee of Defendants Pilgrim and Discovery.

13. At all times pertinent to the issues contained in the matter, Defendant Day was acting in the course and scope of his relationship/employment for Pilgrim and/or Discovery, for the benefit and profit of Pilgrim and/or Discovery.

14. In preparation for the premiere of the television show, which airs on a weekly basis in heavily edited sixty-minute timeslots, Pilgrim, the show's production company, through its agents and employees, began producing content in the form of illegal street races. Said production was done in partnership with Defendant Discovery, for whose use and benefit Pilgrim created the programming. It was in association with the creation of said content that the tortious harm complained of herein arose.

15. On or about September 15, 2017 Defendant Day posted on Facebook to Plaintiff Chad Larkin an inquiry as to whether Mr. Larkin would be interested in getting together for a race to be filmed for the show the following weekend. After several communications between the two, on 9/20/2017 Defendant Day contacted Mr. Larkin and advised the producers had determined the type of race and that a spot was open for a one thousand dollar ($1,000) buy in.

16. The producers were agents acting on behalf of, under the supervision of and for the benefit of the defendants.

17. Mr. Larkin advised that he wanted the spot and asked the producers to call him, which they did on 9/21/2017.

18. On September 22, 2017 in preparation for filming, the producers advised Mr. Larkin to be in Memphis on September 23, 2017. They communicated to him by text message, instructing him to send them a guest list. Mr. Larkin was further advised he could post on social media about the race but that he could not mention "Street Outlaws" or television, likely due to the illegal nature of the event. Mr. Larkin was subsequently advised, during a telephone conversation, that the producers of Pilgrim would provide him the location approximately thirty (30) minutes before he needed to be there on September 23, 2017.

19. At approximately 3:20 p.m. on September 23, 2017, the producers of the show contacted Mr. Larkin with the location of filming. Upon arrival, the Larkins realized the show would be less about reality and more about a contrived production designed to create scandal and controversy.

20. Upon arrival at the 4300 block of Riverport Road, in Memphis, Tennessee, two of the producers approached the Larkin vehicle for a technical inspection. The film crew and photographers were standing near the Larkin vehicle. There was a person dressed in a prisoner outfit and instructed him to act "funny." The camera crew had him run up to the Larkin vehicle and act like he was going to steal it then run up to JJ and say, "you might be JJ but he's the boss" and pointed to Mr. Larkin. This contrived behavior was designed to be inflammatory in the name of good television and ratings.

21. At approximately 10:15 p.m., the producers instructed the racers to line up the vehicles in "car show" fashion, with the Memphis Street Outlaws on one side of the road and the invited racers, such as Mr. Larkin, on the other side of the road.

22. Once all the cars were lined up, the producers instructed everyone except the drivers to leave so they were not in the camera shot. The drivers were instructed to stand by their cars. At this time, they were provided with direction on how to behave.

23. Defendant Day explained his version of what was to transpire. Day stated the invited racers should do everything possible to get into the Memphis Street Outlaws heads because that is what the Memphis Street Outlaws were going to do to the invited racers. He advised "talking trash, whatever you had to do to get into our heads" was encouraged.

24. At one point, while Defendant Day was talking, the invited racer next to Larkin stepped into the center of the road so he could hear Day. For no discernible reason, Day walked up to him very quickly and aggressively and got close to his face and said, "What the fuck is on your mind, why are you stepping out like that." Although the racer advised Day he was just trying to hear what he was saying, Day still remained hostile and aggressive in his demeanor.

25. The above instructions and actions are significant because they demonstrate the type of hostility that was willfully and intentionally created on the set of the show, all with the knowledge, supervision, and even encouragement of the defendants.

26. Ultimately, as it became "race time," the first race involved a Memphis Street Outlaw named Precious against an invited racer from Texas.

27. When the race started "Precious" jumped the start signal, which was an arm drop. When this happened, the invited racer from Texas did not follow. This is important because of a racing principle stated repeatedly on the show. That principle/rule is referred to as "Chase is a race." This means if one driver leaves before start signal/arm drop and the other driver follows, it is a legal race. If the second driver chooses not to chase, the driver that leaves early loses by disqualification.

28. When the invited racer did not follow, he won the race by disqualification. This caused Mr. Day to become outraged. He began cursing and screaming, calling for an immediate meeting with his Memphis Street Outlaws group. Upon convening the meeting, Day instructed his group of racers to pull "every dirty trick they could." He was "declaring war" on the invited racers. He was going to "burn them down," a practice wherein Day's racers would deliberately delay in an effort to cause the invited racers' vehicles to overheat. Day stated that he was going to "talk trash, anything to get in their heads."

29. At this point, it was obvious to the defendant producers that violence was foreseeable due to the extremely heated emotions of Day, as well as his criminal history. The producers of Pilgrim on behalf of Discovery knew or should have known that a physical altercation was likely to occur. Said occurrence was at this point reasonably foreseeable to the producers of Pilgrim on behalf of Discovery.

30. The producers of Pilgrim on behalf of Discovery owed a duty to Plaintiffs to intervene and halt the production for a period of time to allow heated emotions to cool down, or to take other remedial action. The producers however made the willful decision not to do so and this was exactly the type of programming Pilgrim was producing on behalf of Discovery and exactly the type of programming Discovery requested: sensationalistic trash likely to result in violence. In failing to intervene, these defendants breached a duty owed to Mr. Larkin.

31. In the alternative, if, arguendo, the failure of the producers to intervene and halt production was not intentional, said failure constituted negligence on their part.

32. As emotions continued to run high, Plaintiff Chad Larkin yelled over to Day, "Don't be mad because this guy beat you at your own game." In doing so, Mr. Larkin was behaving in accord with pre- production instruction from the producers of the programming.

33. Day then ran from across the road and confronted Mr. Larkin. Mr. Larkin advised, "Don't get in my face… You tried to cheat on that race and got beat anyway." Larkin challenged Day to a race with an impartial starter, to which Day replied, "Fuck you fat boy, get your own show." Throughout the entirety of this confrontation, there were two cameras focused on Larkin and Day, one on each side of them, filming.

34. Again, at this point, it was obvious to the defendant producers that violence was foreseeable due to the extremely heated nature of the confrontation and the escalating emotions.

35. The producers of Pilgrim on behalf of Discovery knew or should have known that a physical altercation was likely to occur. Said occurrence was at this point reasonably foreseeable to the producers of Pilgrim on behalf of Discovery.

36. The producers of Pilgrim on behalf of Discovery owed a duty to Plaintiffs to intervene and halt the production for a period of time to allow heated emotions to cool down. The producers however made the willful decision not to do so and this was exactly the type of programming Pilgrim was producing on behalf of Discovery and exactly the type of programming Discovery requested- sensationalistic trash likely to result in violence.

37. In the alternative, if, arguendo, the failure of the producers to intervene and halt production was not intentional, said failure constituted negligence on their part.

38. At this point, the producers of the show should have known a hostile situation was developing and stopped filming, taken a break, and should have asked Mr. Larkin to leave or engage in any manner of remedy to de-escalate a heated situation.

39. Further, upon information and belief, based on years of knowledge of Day's character and demeanor, the producers had an even greater knowledge a highly volatile situation was developing. Further, upon information and belief, the producers were or should have been

aware that Mr. Day had previously spent significant time is prison for crimes that would have put them on knowledge of his propensity for violent and inflammatory actions such as those committed herein. However, the producers chose to do nothing as it was resulting in the exact type of inflammatory product Discovery requested and Pilgrim produced.

40. In the alternative, if, arguendo, the failure of the producers to intervene and halt production was not intentional, said failure constituted negligence on their part.

41. As production continued, the next race to occur was to be between Defendant Day and another racer named James Finney. While doing the coin toss to determine which lane each racer got, it was clearly visible that Day was enraged, to the point of having difficulty controlling his speech.

42. Mr. Larkin approached to encourage Finney. He yelled to Mr. Finney, "good luck, let's win this thing. Let's all of us out of towners pull together as a team and show these Memphis Street Outlaws they aren't as fast as they think they are."

43. At that point Mr. Larkin heard someone yelling and cursing at him. He looked to the direction it was coming from and saw two of the Memphis Street Outlaws, Bounty Hunter and Mustang Mike, both also agents of the defendants Pilgrim and Discovery, cursing at him. They were being restrained because they were attempting to attack Larkin.

44. Larkin was surprised by this. He told them that he did not say "shit" to them. In Larkin's mind, he was acting exactly as he had both observed people act for years on Street Outlaws and as he was instructed to act as part of the show.

45. When Larkin turned around, his wife, Plaintiff Genny Larkin yelled, "look out." When Larkin turned around, Defendant Day and the other two individuals were running across the street at him. Day and "Bounty Hunter" threw punches at Larkin and tackled him to the ground.

46. As Larkin went down, he felt immediate pain in his leg, as though his "muscles and tendons were ripping." At that point Larkin was on his back with his face exposed. The Bounty Hunter and Day continued the assault, punching Larkin in the face repeatedly and kicking him in the ribs.

47. As the assault continued, Larkin literally believed the Street Outlaws were attempting to kill him. He literally feared for his life.

48. While the assault was ongoing, the producers of the show made no effort to stop it. Rather, the camera crew and producers continued filming. In fact, incredibly, one of the producers instructed a camera man to get closer and get a better shot.

49. Due to the complete failure of the Defendants to take any action to stop the assault, Ms. Larkin was forced to attempt to get the Memphis Street Outlaws off her husband. When she did so, a female member of the Memphis Street Outlaws grabbed the back of her head and pulled her to the ground by her hair, resulting in physical and emotional injury.

50. When the assault finally stopped, Mr. Larkin immediately realized he had suffered substantial personal injury including but not limited to injury to his leg, right eye, back, and other body parts, all necessitating his transport by ambulance to the hospital.

51. Notwithstanding Larkin's injuries, the producer instructed the emergency medical technicians to "get off his set." He further instructed a camera person to "get a good shot of Mr. Larkin's face all bloody," a scene actually aired on television.

52. The unnecessary and aggressive assault on Mr. Larkin caused him to suffer extensive bodily injuries, including but not limited to, damage to his knee, face, eye, head, and back.

53. The unnecessary and aggressive assault on Mrs. Larkin caused her to suffer extensive bodily injuries, including but not limited to, damage to her head, neck, back and arm.

## IV. CLAIMS

**ASSAULT AND BATTERY AGAINST CHAD LARKIN AND GENNY LARKIN**

54. The wrongful acts and conduct of Defendant Day, as set forth and described herein, were intended to cause harmful and offensive contact to Mr. Larkin, and such harmful and offensive contact upon Mr. Larkin occurred, all without the actual and apparent consent of Mr. Larkin and without justification.

55. Said conduct was the proximate cause of Plaintiff Chad Larkin's injuries.

56. The wrongful acts and conduct of the member of the Memphis Street Outlaws who threw Ms. Larkin to the ground, as set forth and described herein, were intended to cause harmful and offensive contact to Ms. Larkin, and such harmful and offensive contact upon Ms. Larkin occurred, all without the actual and apparent consent of Ms. Larkin and without justification.

57. Such conduct constitutes a tortious assault and battery under Tennessee common law.

58. This Memphis Street Outlaw referenced in paragraph 55 above was at all times relevant acting as an agent for each of the named Defendants, jointly and severally.

59. Said conduct was the proximate cause of Plaintiff Genny Larkin's injuries.

## V. VICARIOUS LIABILITY OF DEFENDANT PILGRIM AND DEFENDANT DISCOVERY

60. At all relevant times hereto, Defendant Day, and the other members of Street Outlaws Memphis, including but not limited to Bounty Hunter and Mustang Mike, were authorized employees, agents and/or representatives of Defendant Pilgrim and/or Discovery, engaged in the

business of Defendant Pilgrim and/or Discovery and in the course and scope of their employment with Defendant Pilgrim and/or Discovery.

61. At all times relevant hereto, Defendant Pilgrim and/or Defendant Discovery were acting by and through its employees/agents and is responsible for the acts and omissions of those employees and agents pursuant to the doctrine of *respondeat superior*, agency, or other similar theories of law. Therefore, Defendant Pilgrim and/or Discovery are and should be held liable for the intentional acts of Defendant Day as well as the other agents of Defendants under the doctrine of *respondeat superior* and other theories of vicarious liability.

### VI. OUTRAGEOUS CONDUCT/ INTENTIONAL AND/OR RECKLESS INFLICTION OF EMOTIONAL DISTRESS BY DAY

62. The intentional wrongful acts and conduct of Defendant Day against Plaintiff Chad Larkin as set forth and described herein, were extreme and outrageous and engaged in with the intention of, or with the reckless disregard of, causing Mr. Larkin emotional distress. His actions were so outrageous as to not be tolerated by a civilized society.

63. As a direct and proximate result of the Day's intentional and/or reckless conduct, Mr. Larkin has suffered severe emotional distress.

64. Such conduct constitutes the tortious intentional and/or reckless infliction of emotional distress Tennessee common law.

65. As such Day is liable to Larkin for the intentional infliction of emotional distress.

### VII. OUTRAGEOUS CONDUCT/ INTENTIONAL AND/OR RECKLESS INFLICTION OF EMOTIONAL DISTRESS BY PILGRIM AND DISCOVERY

66. The Defendants' intentional and/or reckless conduct, both individually and in conspiracy with each other, as performed by the acts and omissions of their employees/ agents

including Day, the other members of the Memphis Street Outlaws and the producers and crew of the show is so outrageous as not to be tolerated by a civilized society.

67. The Defendants willfully failed to take reasonable precautions to provide for the safety of its customers, including Mr. and Ms. Larkin. In fact, Defendants Pilgrim and Discovery affirmatively incited the behavior that resulted in the assault upon Mr. Larkin and Ms. Larkin each.

68. Such conduct constitutes the tortious intentional and/or reckless infliction of emotional distress Tennessee common law.

69. As a direct and proximate result of the Defendants' intentional and/or reckless conduct, Mr. Larkin has suffered severe emotional distress.

70. As a direct and proximate result of the Defendants' intentional and/or reckless conduct, Mr. Larkin has suffered severe emotional distress.

71. As such Defendants Pilgrim and Discovery are each jointly and severally liable to Mr. Larkin and Ms. Larkin for the intentional and/or reckless infliction of emotional distress.

## VIII. PUNITIVE DAMAGES- DAY

72. The wrongful acts and conduct of Day were committed and engaged in with malice, express or implied; and with the intent to harm and injure Plaintiff Larkin, and with the conscious disregard of the probable harmful consequences of his wrongful acts and conduct.

73. Day's actions subjected Plaintiff Larkin to cruel and unjust hardship and were committed and engaged in with a conscious disregard of Plaintiff's rights.

74. Plaintiff Larkin is entitled to punitive damages in such amount as shall be necessary and appropriate to punish Defendant Day and to deter Defendant Day and anyone else from ever engaging in such behavior again.

## IX. PUNITIVE DAMAGES- PILGRIM

75. Defendant Pilgrim expressly authorized and/or ratified Day and the Memphis Street Outlaws' wrongful acts and conduct as set forth and described herein.

76. In so doing, Pilgrim acted against, and/ or caused acts to be committed against the Larkins that were committed and engaged in with malice, express or implied; and with the intent to harm and injure Plaintiffs Chad Larkin and Genny Larkin, and with the conscious disregard of the probable harmful consequences of their wrongful acts and conduct.

77. Pilgrim's actions and inactions subjected Plaintiffs to cruel and unjust hardship and were committed and engaged in with a conscious disregard of Plaintiffs' rights.

78. Plaintiffs are each entitled to punitive damages in such amount as shall be necessary and appropriate to punish Defendant Pilgrim and to deter Defendant Pilgrim and anyone else from ever engaging in such behavior again.

## X. PUNITIVE DAMAGES- DISCOVERY

79. Defendant Discovery expressly authorized and/or ratified Day and the Memphis Street Outlaws' wrongful acts and conduct as set forth and described herein.

80. In so doing, Discovery acted against, and/or caused acts to be committed against the Larkins that were committed and engaged in with malice, express or implied; and with the intent to harm and injure Plaintiffs Chad Larkin and Genny Larkin, and with the conscious disregard of the probable harmful consequences of their wrongful acts and conduct.

81. Discovery's actions and inactions subjected Plaintiffs to cruel and unjust hardship and were committed and engaged in with a conscious disregard of Plaintiffs' rights.

82. Plaintiff Larkin is entitled to punitive damages in such amount as shall be necessary and appropriate to punish Defendant Discovery and to deter Defendant Discovery and anyone else from ever engaging in such behavior again.

## XI. CIVIL CONSPIRACY
## TO COMMIT BATTERY AGAINST PLAINTIFFS

83. On September 23, 2017, when the acts described above and re-incorporated herein transpired, Pilgrim, Discovery, and Day conspired each with the other for the sole purpose of obtaining high ratings for the television show Street Outlaws Memphis. In obtaining high television ratings, each of the defendants would realize significant financial remuneration.

84. Plaintiff Chad Larkin, as well as all of the "invited racers," were encouraged by the producers of the show to act in an inflammatory manner. In doing so, the Defendants all conspired with each other to create an environment that would make for "sensational reality television."

85. Defendants Day, Pilgrim, and Discovery were all aware of the highly dangerous nature of inciting hostility on a show like Street Outlaws Memphis in general and on September 23, 2017 in specific, and chose to do so notwithstanding said knowledge solely for the purpose of creating a program that would garner high ratings and financial success.

86. This is evidenced by the fact that Discovery aired the incident in a highly edited fashion on February 26, 2018 in what was Episode 7 of Season 1 of Street Outlaws Memphis.

87. Further, Defendant was aware of this as there had been multiple episodes on Street Outlaws and Street Outlaws Memphis aired before this one that involved altercations. In reality, Defendants knew they had found a formula for a successful television show and followed said formula even though it was clearly foreseeable that injury to people like Mr. Larkin was likely to result.

88. Based on the foregoing, the three Defendants mutually agreed, either tacitly or formally, to engage in the above actions and omissions. They did so either for an unlawful purpose or for a lawful purpose by unlawful means, specifically conducting illegal street racing and inciting violence between the parties. The Defendants, jointly and severally, committed the above stated tortious and wrongful acts with the result being injury and damage to each of the Plaintiffs' person.

89. Such conduct constitutes civil conspiracy under Tennessee common law.

## XII. IN THE ALTERNATIVE, NEGLIGENCE UNDER TENNESSEE COMMON LAW

90. The Defendants, Pilgrim and Discovery, each jointly and severally, owed to Chad Larkin and Genny Larkin a duty of reasonable care to take such precautions as were reasonably necessary to protect them from reasonably foreseeable harm.

91. The Defendants breached this duty.

92. Specifically, the defendants knew or should have known that Mr. and Ms. Larkin were at risk for being assaulted by the Memphis Street Outlaws when the above cited arguments began and continued, specifically including the confrontational actions of Defendant Day.

93. These Defendants had the complete control, wherewithal and duty to intervene and suspend production or take some other remedial action to protect the Larkins from harm.

94. The failure to do so constitutes a negligent breach of a duty owed.

95. Said breach proximately caused the damages suffered by Plaintiffs.

96. Further, once the melee ensued, Defendants failed to have sufficient, if any, plan, procedure or methodology including but not limited to the presence of security or police, in place to stop same, thereby preventing foreseeable injury, such as that incurred by each of the Plaintiffs.

97. Said failure on the part of Defendants constitutes a breach of their duty to the Plaintiffs to take such precautions as were reasonably necessary to protect the plaintiffs from injury from actions that were reasonably foreseeable.

98. Said breach proximately caused the damages suffered by Plaintiffs.

### XIII. DAMAGES

99. As a direct and proximate result of the Defendants actions as stated above, both jointly and severally, the Plaintiffs Chad Larkin and Genny Larkin received serious and painful physical and mental injuries. Additionally, each suffered a loss of loss of consortium for the loss of companionship, comfort and services of the other.

100. As a direct and proximate result of the actions and inactions of each of the Defendants both jointly and severally, Mr. and Ms. Larkin are each entitled to recover from each of the Defendants compensatory damages for the following:

    a. Physical pain and suffering, past and future;

    b. Medical Expenses, past and future;

    c. Loss of enjoyment of life, past and future;

    d. Emotional suffering and grief, past and future

    e. Lost wages

    f. Loss of consortium, companionship, comfort and services from their spouse.

    g. All other damages and general relief to which they may each one be entitled under the law and evidence, including but not limited to the damages resulting from the civil conspiracy of the Defendants.

101. As a direct and proximate result of the Defendants' outrageous conduct and willful, intentional and/or reckless disregard for the rights and physical and emotional well-being of Mr. Larkin and Ms. Larkin, as set forth herein, each Plaintiff received serious and painful mental and physical injuries and is entitled to punitive damages.

102. As a direct result of the actions and inactions of the Defendants both jointly and severally, Plaintiff Chad Larkin has suffered a loss of consortium for the loss of companionship, comfort and services of his wife, Genny Larkin.

103. As a direct result of the actions and inactions of the Defendants both jointly and severally, Plaintiff Genny Larkin has suffered a loss of consortium for the loss of companionship, comfort and services of her husband, Chad Larkin.

## XIV. RELIEF SOUGHT

**WHEREFORE, PREMISES CONSIDERED**, the Plaintiffs, Chad and Genny Larkin, pray:

1. That the Defendants be served with a copy of the Summons and Complaint and be required to answer within the time prescribed by law.

2. That Mr. Larkin be awarded compensatory damages in an amount not to exceed five million ($5,000,000) dollars.

3. That Mr. Larkin be awarded punitive damages in an amount not to exceed five million ($5,000,000) dollars.

4. That Ms. Larkin be awarded compensatory damages in an amount not to exceed five hundred thousand ($500,000.00) dollars.

5. That the costs of this cause be assessed against the Defendants.

6. That Plaintiffs be awarded attorney's fees and other litigation costs.

7. That a jury be empaneled to hear this case.

8. For such other relief as the Court deems just.

                                      Respectfully Submitted,

                                      **RAYBIN & WEISSMAN, P.C.**

                                      /s/David J. Weissman  
                                      David J. Weissman (#025188)  
                                      424 Church Street, Suite 2120  
                                      Nashville, Tennessee 37219  
                                      (615) 256-6666  
                                      (615) 254-4254 – fax  
                                      *Attorney for Plaintiffs*

**CERTIFICATE OF SERVICE**

      I hereby certify that a copy of the foregoing is being forwarded via the Court's electronic filing system to:

Randall J. Fishman, Esq.
Joseph Horowitz, Esq.
Ballin, Ballin & Fishman, P.C.
200 Jefferson Avenue, Suite 1250
Memphis, TN 38103
*Attorneys for Defendant Jonathan Day*
*a/k/a JJ Da Boss*

Howard Brett Manis, Esq.
The Cochran Firm
One Commerce Square, Suite 1700
Memphis, TN 38103
*Attorneys for the Plaintiffs*

Ronna D. Kinsella, Esq.
Glassman, Wyatt, Tuttle & Cox, P.C.
26 N. Second Street
Memphis, TN 38103
*Attorneys for Defendants Pilgrim Operations, LLC*
*and Discovery, Inc.*

      On the 10th of June, 2019.

                      */s/ David J. Weissman*
                        David J. Weissman